1
2
3
4                          UNITED STATES DISTRICT COURT
5                        NORTHERN DISTRICT OF CALIFORNIA
6
7    MICHAEL MASSEL,                           Case No.  23-cv-02389-PCP
8                       Plaintiff,
9          v.                                  **ORDER DENYING MOTION TO
                                               COMPEL ARBITRATION**
10   SUCCESSFULMATCH.COM,
11                      Defendant.
12
13          Plaintiff Michael Massel bring this putative class action against defendant

14   SuccessfulMatch.com doing business as Millionaire Match.[1] Mr. Massel alleges in his complaint

15   that Millionaire Match, the "largest millionaire dating service," violated the Illinois Biometric

16   Information Privacy Act. Millionaire Match has moved under the Federal Arbitration Act to

17   compel individual arbitration of Mr. Massel's claims, arguing that Mr. Massel agreed to

18   Millionaire Match's Service Agreement and the arbitration provision therein when he created his

19   Millionaire Match account. For the reasons set forth below, the Court concludes that Millionaire

20   Match has not shown that Mr. Massel assented to its Service Agreement and its motion to compel

21   arbitration under that agreement is therefore denied.

22   **I.      Background**

23          This motion turns on Millionaire Match's signup page, the nature of which is not

24   contested. According to Millionaire Match's motion, Mr. Massel would have encountered the

25   following screen when he signed up for his Millionaire Match account on January 7, 2023:

26
27
28   _____

     [1] As the parties have done, the Court refers to defendant as "Millionaire Match" for clarity.

United States District Court
Northern District of California

Motion, Dkt. No. 20, at 9. As the screenshot shows, the signup page first alerts prospective users in prominent bold, capitalized text that "no sugar daddies or sugar babies" are allowed on Millionaire Match. *Id.* Below that, in less prominent normal-weight gray type, the following message appears:

> Consent to Our Service Agreement and Privacy Policy
>
> A Service Agreement and a separate Privacy Policy govern the relationship between MillionaireMatch.com and all of its members. To become one of our members, you need to review and agree to the terms and conditions of both agreements and check the "Agree" box below. If you disagree ,you will not be given access to the site.

2

*Id.* Under that, a checkbox appears next to text that reads "Agree to both the <u>Service Agreement</u> and <u>Privacy Policy</u>." *Id.* According to Millionaire Match, the terms "Service Agreement" and "Privacy Policy" are hyperlinks. As the screenshot shows, these hyperlinked terms are underlined but appear in the same dark gray color as the unlinked text in the rest of the sentence. Millionaire Match asserts that "Service Agreement" links to the text of that agreement, which reads:

**END USER SERVICE AGREEMENT**

**1. Introduction** …

**PLEASE READ THE TERMS OF THE AGREEMENT CAREFULLY. IF YOU CHOOSE TO ACCEPT THE AGREEMENT BY CHECKING THE "I AGREE" BOX, YOU UNDERSTAND AND CONSENT TO BE BOUND TO THE TERMS OF THIS AGREEMENT, INCLUDING … THE ALTERNATIVE DISPUTE RESOLUTION PROVISIONS [AND] THE CLASS ACTION WAIVER.**
…

**17. General**

17.1 Governing Law. Regardless of where you live or from which physical location you access our Service, the substantive and choice of law provisions of the State of California shall apply to this Agreement and your access and use of the Service, and any action related thereto, without regard to California's conflict of law provisions, but California law shall not apply to the arbitration provisions in Section 17.3 of this Agreement, which are governed solely by the Federal Arbitration Act.
…

17.3 Alternative Dispute Resolution. By entering into this Agreement, you agree that, if any dispute arises out of or in any way related to this Agreement and/or your use of the Service, any and all such disputes shall be resolved by submission to binding arbitration in San Francisco, California before a retired judge or justice with JAMS pursuant to JAMS Comprehensive Arbitration Rules and Procedures in effect at the time of any such dispute. We mutually agree that the arbitrator, and not any federal, state, or local court or agency, shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this Agreement, including, but not limited to, any claim that all or any part of this Agreement is void or voidable. If the parties are unable to agree on a JAMS retired judge or justice within fifteen (15) calendar days of a demand for arbitration filed with JAMS by either of us, JAMS

will follow the procedure in its Comprehensive Arbitration Rules and Procedures to name a retired judge or justice who will act as the sole arbitrator. Any decision of the arbitrator may be confirmed by a court of competent jurisdiction and the ensuing judgment may thereafter be enforced in the same manner as a judgment in a civil action. The ensuing judgment may also be appealed pursuant to applicable federal law. You acknowledge and agree that this Agreement involves interstate commerce and that this arbitration provision is governed by the Federal Arbitration Act.

17.4 Class Action Waiver. Except as otherwise required under applicable law, (i) we mutually intend and agree that neither will assert any class actions or representative actions, nor will such actions or procedures apply in any arbitration pursuant to this Agreement; (ii) we mutually agree that neither will assert class action or representative action claims against the other in arbitration or in any other proceeding or action; and (iii) you shall only submit your own, individual claims in arbitration and will not seek to represent the interests of any other person.

17.5 Arbitration Confidentiality. The Disputes, as well as the arbitration proceedings and award regarding such Disputes, shall be kept strictly confidential and governed by the Nondisclosure Agreement ("NOA") provisions addressed elsewhere in this Agreement.

17.6 Arbitral Jurisdiction. We agree that this Agreement involves interstate commerce and the arbitration will be governed by the provisions of the Federal Arbitration Act (9 U.S.C. 1 et seq.). California substantive law shall govern the underlying Disputes to be arbitrated. We agree that the arbitrator, not any federal or state court judge, shall have the exclusive jurisdiction to resolve any and all disputes regarding the arbitrator's jurisdiction and the interpretation, applicability, enforceability or formation of this binding Agreement to arbitrate, including but not limited to determining which Disputes are subject to arbitration, or any contention that all or any part of this arbitration agreement is unenforceable, voidable or void.

Dkt. No. 21-1, at 1, 7–8.

Mr. Massel filed a putative class action against Millionaire Match on May 16, 2023, bringing five claims for violation of Illinois's Biometric Information Privacy Act. Millionaire Match subsequently moved for an order compelling arbitration of these claims under the Federal Arbitration Act, arguing that all of Mr. Massel's claims are covered by the arbitration provision of the Service Agreement to which he allegedly agreed.

4

United States District Court
Northern District of California

## II.      Legal Standards

The Federal Arbitration Act provides that a "written provision in … a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. As this language makes clear, "an arbitration agreement is a contract like any other." *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1009 (9th Cir. 2023). And like other contracts, arbitration agreements are subject to "generally applicable contract defenses" like "fraud, duress, or unconscionability." *Lim v. TForce Logs., LLC*, 8 F.4th 992, 999 (9th Cir. 2021). There is one way arbitration provisions in a contract are distinct, however: "[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006). In other words, notwithstanding state law on severability, an arbitration provision can be valid and enforceable even if other parts of the contract it is in are not.

A purported arbitration agreement presents a few "gateway" issues: First, whether an agreement to arbitrate was actually formed. *See Ahlstrom v. DHI Mortg. Co., Ltd., L.P.*, 21 F.4th 631, 634–35 (9th Cir. 2021). Second, whether that agreement is "valid," *Bielski*, 87 F.4th at 1009, in other words, whether there are any defenses. Third, "whether the agreement encompasses the dispute at issue." *Id.* Normally, these gateway questions are resolved by a court. But parties to an arbitration provision can also enter a separate agreement to arbitrate some of these gateway questions—a "delegation" provision. "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010). And, like any other arbitration provision, a delegation provision is severable. *See Buckeye*, 546 U.S. at 445. Not all gateway questions can be delegated, however. While "some 'gateway' issues…, such as issues of validity and arbitrability, can be delegated," "parties cannot delegate issues of formation." *Ahlstrom*, 21 F.4th at 634–35.

All of this means that when presented with a contract that includes both an arbitration provision and a delegation provision, a reviewing court can consider three types of challenges:

5

(1) formation challenges to the delegation provision, *see Ahlstrom*, 21 F.4th at 635; (2) validity and enforceability challenges to the delegation provision, *see Bielski*, 87 F.4th at 1009; and (3) formation challenges to the underlying arbitration provision, *see Ahlstrom* at 635. But if the delegation provision is valid, the court cannot consider validity or enforceability challenges to the underlying arbitration provision. *See also Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022) ("First, a court must resolve any challenge that an agreement to arbitrate was never formed, even in the presence of a delegation clause. Next, a court must also resolve any challenge directed specifically to the enforceability of the delegation clause before compelling arbitration of any remaining gateway issues of arbitrability. Finally, if the parties did form an agreement to arbitrate containing an enforceable delegation clause, all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide.").

Formation challenges to either a delegation provision or an underlying arbitration provision are a matter of state law. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) ("In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation."). To challenge the validity or enforceability of a delegation provision, "a party resisting arbitration must mention that it is challenging the delegation provision and make specific arguments." *Bielski*, 87 F.4th at 1009. But while challenges must be specific, they need not be unique: A party "may challenge the delegation provision and the arbitration agreement for the same reasons, so long as the party specifies why each reason renders the specific provision unenforceable." *Id.* at 1009–10.

If there is no delegation provision (or if one is successfully challenged), the Court must resolve the gateway questions: whether the arbitration agreement was formed, whether there are defenses or validity challenges to that agreement, and whether that agreement covers the dispute.

If the Court is "satisfied that the making of the agreement for arbitration … is not in issue" it must "make an order directing the parties to proceed to arbitration." 9 U.S.C. § 4. The summary judgment standard applies. *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021). The Court must "give to the opposing party the benefit of all reasonable doubts and inferences." *Sanford v. MemberWorks, Inc.*, 483 F.3d 956, 963 (9th Cir. 2007).

**III.    Discussion**

Mr. Massel challenges formation of an agreement to arbitrate. This is an issue that cannot be delegated and must be resolved by the Court. If the parties did form an agreement to arbitrate (and agreed to delegate questions of arbitrability), the Court must send any disputes between Mr. Massel and Millionaire Match to JAMS. But if the parties never formed such an agreement, Mr. Massel's claims cannot be compelled to arbitration and are properly before this Court.

The parties do not dispute that California law governs the question of formation. The Ninth Circuit recently summarized California's standard for determining whether a website user assented to an agreement like Millionaire Match's that is hyperlinked during a sign-up process:

> To form a contract under California law, the parties must manifest their mutual assent to the terms of the agreement. Parties traditionally manifest assent by written or spoken word, but they can also do so through conduct. However, the conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents. These elemental principles of contract formation apply with equal force to contracts formed online. Thus, if a website offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed.

> To avoid the unfairness of enforcing contractual terms that consumers never intended to accept, courts confronted with online agreements ... have devised rules to determine whether meaningful assent has been given. Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms. Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility.

*Patrick v. Running Warehouse, LLC*, __ F.4th __, 2024 WL 542831, at *3 (9th Cir. 2024) (cleaned up).

Here, Millionaire Match has not shown that Mr. Massel had actual knowledge of its Service Agreement when he signed up for an account. Mr. Massel states that the terms "Service

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Agreement" and "Privacy Policy" on the signup page "did not appear to be hyperlinked" when he

2    created his account, and that he "was not aware of any opportunity to review the Service

3    Agreement" before signing up. Dkt. No. 26-2, at 2. As a result, he says he "did not read the

4    Service Agreement or Privacy Policy" before creating an account. *Id.*

5         Accordingly, Mr. Massel can only be bound by the Service Agreement if Millionaire

6    Match provided "reasonably conspicuous notice of the terms" to which it asserts he is bound, and

7    if Mr. Massel took "some action, such as … checking a box, that unambiguously manifest[ed] his

8    … assent to those terms." *Running Warehouse*, 2024 WL 542831, at *3.

9         Recent Ninth Circuit precedent establishes that Millionaire Match did not provide Mr.

10   Massel with the reasonably conspicuous notice necessary under California law to bind him to its

11   arbitration requirement. In *Berman v. Freedom Financial Network, LLC*, for example, the Ninth

12   Circuit, applying California law, held that "while it is permissible to disclose terms and conditions

13   through a hyperlink, the fact that a hyperlink is present must be readily apparent," and emphasized

14   that a "web designer *must do more than simply underscore the hyperlinked text* in order to ensure

15   that it is sufficiently set apart from the surrounding text." 30 F.4th at 857 (emphasis added). The

16   *Berman* court rejected as inconspicuous hyperlinks that were underlined but did not include other

17   "customary" design elements for hyperlinks, such as "use of a contrasting … color" or "all capital

18   letters," that would have alerted users that the text was clickable. *Id.* In *Running Warehouse*, by

19   contrast, the Ninth Circuit (again applying California law) concluded that hyperlinks at issue were

20   reasonably conspicuous. 2024 WL 542831, at *4. Those links were "bright green"—the same

21   color as other clickable links on the page. *Id.* The court concluded that they were "reasonably

22   conspicuous" even though they were "not blue, underlined, or capitalized." *Id.*

23        These two recent Ninth Circuit opinions hold that, under California law, presenting a link

24   in a contrasting color, without more, can be enough to make the link reasonably conspicuous but

25   merely underlining a link that appears in the same color as the body text is not. Millionaire

26   Match's website design falls within the latter category. Because Millionaire Match's links were

27   underlined but did not appear in a contrasting color, the Court must conclude, under *Berman*, that

28   they were not reasonably conspicuous enough to put Mr. Massel on notice of the terms and that

Mr. Massel therefore cannot be said to have assented to them. This conclusion is bolstered by the fact that other links on the signup page appear in all capital letters while the links to the Service Agreement and Privacy Policy are in title case. These distinctions may seem picayune, but website operators like Millionaire Match have ultimate control over their design decisions. Nothing requires them to present terms as subtle hyperlinks to separate pages instead of, say, requiring users to scroll through the actual terms before signing up.

Because Mr. Massel did not assent to the Service Agreement, he never formed an agreement to arbitrate his claims against Millionaire Match (or to arbitrate arbitrability) under California law.

## IV.    Conclusion

For the reasons set forth above, Millionaire Match's motion is denied.

**IT IS SO ORDERED.**

Dated: February 27, 2024

P. Casey Pitts
United States District Judge